**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| **READING HOSPITAL**, *on behalf of itself and* *all others similarly situated* | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:24-cv-02715-JMG |
| | : | |
| **HILL-ROM HOLDINGS, INC.***, et al.* | : | |
| Defendants. | : | |

---

**MEMORANDUM OPINION**

GALLAGHER, J.                                                September  9, 2025

## I.    OVERVIEW

Reading Hospital ("Plaintiff"), on behalf of itself and all others similarly situated, has brought antitrust claims against Hill-Rom Holdings, Inc., Hill-Rom Company, Inc., and Hill-Rom, Services, Inc. (collectively "Hill-Rom" or "Defendants"). Plaintiff alleges that Defendants have violated antitrust laws and engaged in anticompetitive practices in the hospital bed industry. Because Plaintiff's allegations are conclusory, the Court will grant Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.

## II.    PROCEDURAL & FACTUAL BACKGROUND

Plaintiff brings several antitrust claims against Defendants. The Court recites the facts as Plaintiff alleges them in its Amended Complaint, *see* ECF No. 26, and is bound to take Plaintiff at its word—only for the purposes of adjudicating this Motion. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ("[I]n deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences drawn in favor of them.").

1

This case is about competition in the United States hospital bed industry. Defendants are participants in the industry as suppliers of hospital beds. *See* ECF No. 26 at ¶ 12. The Amended Complaint discusses three *distinct* types of products and corresponding markets: (1) standard hospital beds, (2) intensive care unit ("ICU") beds, and (3) birthing beds (collectively "the products"). *See generally id.* at ¶¶ 12-15. Plaintiff alleges that it purchased the products from Defendants. *See id.* at ¶ 15.

There are similar facts that apply to each of the three markets. The healthcare industry recognizes each bed as a separate product market. *See id.* at ¶¶ 17, 38, 54. Given this, each bed is "priced as a distinct product, with a separate price point from other types of hospital beds." *See id.* at ¶¶ 18, 39, 55. For each of the products, "there are no reasonably interchangeable products" and "no cross-elasticity of demand" between them. *See id.* at ¶¶ 21-22, 42-43, 58-59. The geographic market for the sale of each of the products is the United States. *See id.* at ¶¶ 24, 45, 61.

Plaintiff provides information that is specific to each of the three products and markets:

**A. Standard Hospital Beds**

The largest market is for standard hospital beds. *See id.* at ¶ 12. These are "generic beds used throughout a hospital to care for the majority of admitted and non-critical patients." *Id.* at ¶ 6. Plaintiff approximates that there are 666,000 standard hospital beds installed in the United States. *Id.* These beds are also known as universal beds or medical-surgical beds. *Id.* at ¶ 16. Plaintiff pleads that Defendants control a market share of at least 75% of standard hospital beds installed in the United States. *See id.* at ¶ 27. This equates to over 500,000 individual beds installed. *Id.* Plaintiff alleges that this "installed base" is "the only appropriate measure of market power" because the market for standard hospital beds in the United States is "mature." *Id.* at ¶ 30. Annual sales of standard hospital beds "are typically less than 50,000 beds to 60,000 beds, or on the order

of 7% of the overall installed base." *Id.* at ¶ 30. Though, Plaintiff notes volatility in this market. *See id.* Not considering the installed base measurement, Plaintiff alleges that Defendants enjoy "a market share of at least 64% of Standard Hospital Beds based on estimated annual market sales." *Id.* at ¶ 33.

Defendants offer only one type of standard hospital bed, known as the Centrella bed. *See id.* at ¶ 34. Defendants sell these beds to medical facilities in all fifty states "through interstate commerce under supply agreements with its customers." *Id.* at ¶ 35.

Plaintiff alleges that, because of Defendants' allegedly anticompetitive conduct, "there are now only two principal competitors to Hill-Rom in the Standard Hospital Bed market: Stryker Corporation ("Stryker") and Linet." *Id.* at ¶ 36. The standard hospital beds made and sold by each of these companies are "close substitutes and can be used interchangeably." *Id.*

**B. ICU Beds**

The second largest market is for ICU beds. *See id.* at ¶ 13. These are beds with "advanced functionality to care for patients in [a] critical care condition." *Id.* at ¶ 37. These beds are "used in units where constant, close monitoring and support is provided to patients with severe life-threatening conditions and injuries." *Id.* Plaintiff approximates that there are 86,000 beds installed in the United States. *See id.* at ¶ 48. Plaintiff pleads that Defendants control a market share of at least 70% of ICU beds installed in the United States. *See id.* Defendants are also alleged to "enjoy[ ] a market share of at least 75% of ICU Beds based on estimated annual market sales." *Id.* at ¶ 49.

Defendants offer only one type of ICU bed, known as the Progressa bed. *See id.* at ¶ 50. Defendants sell these beds to medical facilities in all fifty states "through interstate commerce under supply agreements with its customers." *Id.* at ¶ 51.

Plaintiff alleges that, because of Defendants' allegedly anticompetitive conduct, "there are now only two principal competitors to Hill-Rom in the ICU Beds market in the U.S.: Stryker and Linet." *Id.* at ¶ 52. The different ICU beds made and sold by each of these companies "are all close substitutes and can be used interchangeably." *Id.*

### C.  Birthing Beds

Third, is the market for birthing beds. These beds are "used in hospital labor and delivery units to care for patients before, during, and potentially after giving birth." *Id.* at ¶ 52. Plaintiff approximates that there are 26,000 birthing beds installed in the United States. *Id.* at ¶ 64. This amounts to an "estimated base of Birthing Beds" of over 70%. *Id.* at ¶ 64. Defendants are also alleged to "enjoy[ ] a market share of at least 74% of Birthing Beds based on estimated annual market sales." *Id.* at ¶ 65.

Defendant's birthing bed is known as the Affinity 4 bed. *See id.* at ¶ 66. Defendants sell these beds to medical facilities in all fifty states "through interstate commerce under supply agreements with its customers." *Id.* at ¶ 67.

 Plaintiff alleges that, "[t]here are now only two remaining competitors to Hill-Rom in the Birthing Beds market in the U.S.: Stryker and Linet." *Id.* at ¶ 68. The birthing beds made and sold by each of these companies are "close substitutes and can be used interchangeably." *Id.*

### D.  Group Purchasing Organizations ("GPOs") and Integrated Delivery Networks ("IDNs")

While Plaintiff alleges that beds are "typically purchased by individual hospitals," *id.* at ¶ 69, the purchases are not directly negotiated between the purchasing hospitals and suppliers. *See id.* at ¶ 70. The hospitals "place purchase orders . . . based on pricing agreements that have been negotiated with suppliers in advance through GPOs and IDNs of which they are a part, that specify

the product offering and applicable terms." *Id.* These agreements "set out the price and other terms for future purchases made by the customer during the effective period of the contract." *Id.* at ¶ 71.

"GPOs act as purchasing intermediaries that negotiate contracts between their customers—health care providers, such as hospitals—and suppliers of medical equipment and products." *Id.* at ¶ 73. GPOs "screen suppliers and establish base-level pricing and contract terms." *Id.* Joining a GPO allows a hospital to "outsource the contract negotiation process and gain access to the GPOs' negotiated agreements." *Id.* at ¶ 74. Plaintiff estimates that 98% of hospitals in the United States "use GPOs to help them with the procurement process." *Id.*

GPOs typically "bid[ ] out and contract[ ] for hospital equipment at the product level." *Id.* at ¶ 77. Members of the GPO are able to purchase equipment under "pre-negotiated agreements during the time period that the agreement is in effect." *Id.* at ¶ 81. The purchasing customer is, thus, able to "avoid investing time and resources into evaluating and selecting among products or negotiating terms of purchase." *Id.* at ¶ 81. On the supplier side, GPOs give suppliers "access to the hospital system and individual hospital customers." *Id.* at ¶ 82. Plaintiff pleads that "a supplier that is not on a GPO contract is cut off from the vast majority of hospitals in the country" and this "is particularly damaging where the supplier is new in the market or does not have a preexisting relationship with the customer." *Id.*

An IDN, or a "health system," is "an organization that owns or manages two or more hospitals along with other allied healthcare providers." *Id.* at ¶ 84. Plaintiff alleges that over 80% of hospitals in the United States are affiliated with an IDN, which corresponds to more over 91% of hospital beds in the United States being affiliated with an IDN. *See id.* at ¶¶ 87-88. According to the Amended Complaint, this results in a "highly concentrated" distribution system and "centralized decision making" system. *See id.* at ¶¶ 91-92. As IDNs become more prominent within

the healthcare industry, "executives or administrators within IDNs can often be the decision-makers for all of their member hospitals." *Id.* at ¶ 91.

Plaintiff alleges that the IDN system "forc[es] individual hospitals to purchase their requirements from the selected vendor and punish[es] any off-contract purchases." *Id.* at ¶ 92. The IDNs do not do any purchasing themselves, but rather "drive compliance" of their members. *See id.* Exclusion from an IDN "could seriously limit a supplier's ability to reach the majority of U.S. hospitals" and can "cut off a supplier from a significant portion of the market." *Id.* at ¶ 93. IDNs contract at the product level. *See id.* at ¶ 94.

### E.  Allegations of Defendants' Anti-Competitive Conduct

Plaintiff's Amended Complaint alleges anti-competitive, monopolistic practices by Defendants. Plaintiff alleges that Defendants have "monopoly power" in each of the bed's markets. *See id.* at ¶ 96. Defendants are alleged to "maintain[ ] greater than 70% of the installed base in each of the Relevant Markets." *Id.* at ¶ 98. This is said to lead to the ability to "control prices and exclude competition" as well as the ability to "drive change in customer contracting practices to its advantage." *Id.* at ¶¶ 99-100. All the while, Defendants' gross profit margins have increased at an accelerating rate. *See id.* at ¶ 101. Defendants are also alleged to have increased its prices. *See id.* at ¶ 102. Meanwhile, no competitors have entered any of the relevant markets in the last decade. *See id.* at ¶ 103.

Plaintiff alleges that Defendants' monopoly power is protected by several barriers to entry. These include: (1) the significant capital investment required to enter the hospital bed markets, *see id.* at ¶¶ 107-11; (2) Defendants' history of allegedly monopolistic practices, *see id.* at ¶¶ 112-18; (3) Defendants' "longstanding relationships and exclusive dealing arrangements with tip IDNs,

*see id.* at ¶¶ 119-21; (4) Defendants' aggressive pattern of patent enforcement, *see id.* at ¶¶ 122-26; and (5) the strict regulatory regime that governs the medical equipment, *see id.* at ¶¶ 127-30.

### F.  Defendants' Use of the Corporate Enterprise Agreement ("CEA")

The meat of Plaintiff's Amended Complaint is its allegations regarding Defendants' use of CEAs to further its anticompetitive practices in the hospital bed markets. Plaintiffs allege that Defendants "determined to entrench its monopoly by locking up IDNs with confidential, long-term, exclusive dealing agreements." *Id.* at ¶ 135. Defendants are alleged to have targeted IDNs because they were "able to influence customers' purchasing decisions even outside the context of any specific IDN and thus constituted the ideal pressure point to exert its leverage." *Id.* at 136.

Plaintiff alleges that Defendants strategy was to "lock up the top IDNs with exclusive agreements" so that "it would control all of their member hospitals as well." *Id.* at ¶ 137. This would "drive contract compliance to [Defendants'] contractual exclusivity provisions, even if an individual hospital within an IDN would prefer to purchase competing products elsewhere at lower prices." *Id.* Plaintiff alleges that Defendants would "link all of an IDN's buying decisions together and offer substantial rebates in exchange for a confidential agreement to engage in long-term, exclusive dealing" and this set-up "avoid[ed] product-level competition." *Id.* at ¶ 138.

It is alleged these contracts were made at the product level. *See id.* at ¶ 139. "The CEAs were [ ] designed to bundle and link together all of the purchasing decisions by hospitals within an IDN in numerous distinct product markets, including the Relevant Products, into a single overarching agreement with a collective rebate." *Id.* Plaintiff alleges that Defendants' agreements with IDNs were "made to look like multiple, independent product-level agreements, but which Hill-Rom secretly tied together using the CEAs as a strategic overlay." *Id.* at ¶ 140. Essentially the agreements are alleged to be "secret, long-term exclusive dealing agreements" that "condition[ ]

rebates on purchases across multiple different product lines." *Id.* at ¶ 141. Plaintiff alleges that Defendants strictly monitor compliance with the CEAs going so far as to "threaten[ ] IDNs with consequences if they do not accede to Hill-Rom's demands." *Id.* at ¶ 154. Plaintiff also alleged consequences for communicating with competitors. *See id.*

### G.  Plaintiff Alleges the CEAs are Anticompetitive

Plaintiff alleges that the CEAs utilized by Defendants are "anticompetitive exclusive dealing agreements." *Id.* at ¶ 155. With these agreements, Defendants are alleged to target IDNs to "control purchasing decisions and drive contract compliance." *Id.* at ¶ 157. Plaintiff alleges that the CEAs are multi-faceted; there are "separate product-level agreements connected together via the strategic overlay of the CEA." *Id.* at ¶ 158.

Through the CEAs, Plaintiff alleges that IDNs enter into "confidential, long-term, exclusive dealing agreements covering the Relevant Products that force IDNs to purchase all of their requirements from Hill-Rom or, alternatively, agree to an ironclad commitment to purchase a very high percentage . . . of their requirements from Hill-Rom, which operate as *de facto* exclusive dealing agreements." *Id.* at ¶ 160. The CEAs are alleged to contain "exclusivity provisions." *Id.* at ¶ 161. The agreements ensured compliance with this provision "through an overarching incentive and enforcement structure." *Id.* at ¶ 163. The exclusivity provisions are alleged not to be "justified by any legitimate economic or business rationale." *Id.* at ¶ 165. Further it is alleged that all the benefits from such provisions flow to Defendants, rather than the customer. *See id.* at ¶ 166. The exclusivity provisions are binding and "neither IDNs nor their member hospitals are free to walk away from Hill-Rom's CEAs if another competitor offers a better price." *Id.* at ¶ 168. If Defendants "learn[ ] that an individual hospital may be interested in evaluating hospital bed products from another supplier, Hill-Rom informs the IDN corporate partner that it

has committed to purchasing Hill-Rom products and that it is the IDN's obligation to ensure that hospitals within the system purchase Relevant Products from Hill-Rom." *Id.* at ¶ 170. Because of the exclusivity provision, Defendants' "competitors are excluded from any opportunity to make sales within an IDN that has exclusively committed its purchases to Hill-Rom on a long-term basis." *See id.* ¶ 171.

Plaintiff also alleges that Defendants utilized the rebate scheme within the CEAs in furtherance of its anticompetitive conduct: "the CEAs reinforce committed contract by ensuring that an IDN cannot achieve its maximum rebate unless the hospitals within the system purchase effectively all of their requirements for the Relevant Products from Hill-Rom." *Id.* at ¶ 172. The rebate levels are alleged to be "strategically set[ ] . . . so that the spend on the Relevant Products set contributes the greatest amount to a customer's rebate potential across the bundle." *Id.* Plaintiff pleads that the result of this is that "customers who choose not to adhere to the exclusivity provisions on the Relevant Products from Hill-Rom are facts with an across-the-board increase on *all* products they buy from Hill-Rom." *Id.* (emphasis included). Defendants' rebates "leverage the breadth of Hill-Rom's portfolio of beds and other standalone pieces of equipment" and "ensure that it is impossible for any competitor in the Relevant Markets which does not manufacture a similarly broad line of products to demonstrate how offered savings could offset the rebate potential on other products with Hill-Rom." *Id.* at ¶ 173.

Plaintiff alleges that the CEAs "were structured and intended by Hill-Rom to be both long-term and nearly impossible to terminate." *Id.* at ¶ 174. They "effectively last in perpetuity" and last "far longer in duration than is necessary to accomplish a lawful purpose." *Id.* at ¶ 175. Plaintiff points to the fact that the exclusivity provision even exists as evidence of Defendants' monopolistic practices: "The only reason for an exclusive dealing agreement is to lock up a customer that might

prefer to buy one or more of the Relevant Products from other suppliers, so that standardization, switching costs, and entrenched brand preferences can take hold and create a lifelong customer not based on the merit of the products, but rather based on the coerciveness of the agreement." *Id.* at ¶ 178. Plaintiff alleges that, in effect, the CEAs "can potentially exclude rivals for at least 10 to 15 years or longer." *Id.* at ¶ 180. Also, effectually, any termination provision contained in the CEAs is rendered "effectively meaningless" by the high installed base of the Relevant Products. *See id.* at ¶ 182.

The CEAs are also alleged to contain "strict confidentiality clauses" that are "backed by contract provisions full of teeth in order to prevent IDN customers from revealing the existence, let alone the terms, of their CEAs with Hill-Rom." *See id.* at ¶ 188.

### H.  Procedural History

Plaintiff filed its Complaint on June 20, 2024. *See* ECF No. 1. This was followed by the operative Amended Complaint on September 30, 2024. *See* ECF No. 26. Defendants moved to dismiss Plaintiff's Amended Complaint on November 8, 2024. *See* ECF No. 32. Plaintiff filed its response in opposition on December 20, 2024. *See* ECF No. 36. Defendants filed a reply brief in further support of its Motion to Dismiss on January 6, 2025. *See* ECF No. 43. Plaintiff filed its sur-reply in further opposition to Defendants' Motion to Dismiss on January 15, 2025. *See* ECF No. 50. The Court heard oral argument on Defendants' Motion to Dismiss on March 25, 2025. *See* ECF Nos. 54 & 55.

### III.    STANDARD OF REVIEW

Per Fed. R. Civ. P. 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555); *see also Larry Pitt & Associates v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 449 (E.D. Pa. 2014) ("Something more than a mere *possibility* of a claim must be alleged" (emphasis included)). A court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Wheeler v. Wheeler*, 639 F. App'x 147, 149 (3d Cir. 2016) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)).

The fact that Plaintiff brings antitrust claims does nothing to alter this pleading standard. *See Larry Pitt*, 57 F. Supp. 3d at 449 ("Even in complex antitrust cases, courts must apply the plausibility standard and not a heightened standard." (citing *W. Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010))).

## IV.    DISCUSSION & ANALYSIS

### a.    Legal Background

Plaintiff brings claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, however the analysis proceeds the same. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012) ("In order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that the plaintiff suffered antitrust injury as a result." (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-40 (1990)); *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). "Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for us is whether [the defendant] engaged in anticompetitive conduct." *ZF Meritor*, 696 F.3d at

11

269 n.9 (citing *Atl. Richfield Co.*, 495 U.S. at 339). "Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act each include an anticompetitive element." *Id.*

Generally, federal antitrust law prohibits anti-competitive agreements: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nationals, is declared to be illegal." 15 U.S.C. § 1. However, "[b]ecause even beneficial business contracts or combinations restrain trade to some degree, section one has been interpreted to prohibit only those contracts or combinations that are 'unreasonably restrictive of competitive conditions.'" *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993) (quoting *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911)).

### i. Exclusive Dealing Arrangements

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC*, 696 F.3d at 270. Because these agreements "are often entered into for entirely procompetitive reasons, and generally pose little threat to competition," they are not always illegal. *See id.* ("[C]ompetition to be an exclusive supplier may constitute a vital form of rivalry, which the antitrust laws should encourage." (internal quotation marks omitted)).

The legality of an exclusive dealing arrangement is weighed using the "rule of reason." *See Eisai*, 821 F.3d at 403. "The legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271. "[A]n exclusive dealing arrangement is unlawful only if the 'probable effect' of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *Id.*

### ii. The Rule of Reason

Under the rule of reason, a fact-finder "weigh[s] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Brown Univ.*, 5 F.3d at 668 (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).

Under this analysis, a plaintiff must first show "that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant products and geographic markets." *Id.* This can be shown "by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services." *Id.* (internal citation omitted). This can also be shown by proving the defendant's market power. *Id.* ("Market power, the ability to raise prices above those that would prevail in a competitive market, is essentially a surrogate for detrimental effects." (internal quotation marks and citation omitted)). If a plaintiff can meet this initial burden, "the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. Then, "[t]o rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.*

"There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behaving, and the ability of customers to terminate the agreements." *ZF Meritor*, 696 F.3d at 271-72 (internal citations omitted). Another factor that is "sometimes considered" is "[t]he use of exclusive dealing by competitors of the defendant." *Id.* at 272.

A plaintiff cannot "demonstrate that the probable effect of [a defendant's] conduct was to substantially lessen competition in the relevant market" if that plaintiff has not shown "evidence of substantial foreclosure or anticompetitive effects." *Eisai*, 821 F.3d at 407; *see also id.* at 403 ("While there is no set formula for making this determination [of whether an exclusive dealing agreement is lawful], [the court] must consider whether a plaintiff has shown substantial foreclosure of the market for the relevant product.").

### iii.  Substantial Foreclosure

"Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor*, 696 F.3d at 272 (quoting *Untied States v. Dentsply International, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)). "There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Eisai*, 821 F.3d at 403; *see also id.* at 404 n.34 ("Traditionally, a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases." (quoting *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 837 (11th Cir. 2015)).

"To demonstrate substantial foreclosure, a plaintiff 'must both define the relevant market and prove the degree of foreclosure.'" *Eisai*, 821 F.3d at 403 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001)). "In analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer. For example, if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share." *Id.* "Although the test is not total foreclosure, the challenged practices must bar a substantial number of rivals or severely restrict

the market's ambit." *Id.* (internal quotation marks omitted); *but see id.* at 403-04 ("One competitor's inability to compete does not automatically mean competition has been foreclosed").

The Third Circuit has also recognized substantial foreclosure in circumstances where "a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice." *Id.* (citing cases where "consumers had a choice between products" but "the defendant's anticompetitive conduct rendered that choice meaningless") (internal quotation marks omitted).

Substantial foreclosure is a legal conclusion to be reached, rather than a factual allegation that will suffice when pled on its own. *See, e.g.*, *BRFHH Shreveport, LLC v. Willis-Knighton Med. Center*, 49 F.4th 520, 531 (5th Cir. 2022) (affirming dismissal of complaint where plaintiff pled "high-level assertions" that were "conclusory" and did not "tell a coherent story" of substantial foreclosure). A complaint may be dismissed where a plaintiff fails to adequately plead substantial foreclosure. *See id.; see also Larry Pitt & Associates v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 454 (E.D. Pa. 2014) (dismissing antitrust claims where the court was unable to "reasonably infer that the [exclusive advertising] contracts will have a ruinous effect on rivals in the legal market, foreclosing competition in a substantial share of that market."); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, Civ. A. No. 15-108, 2016 WL 264909, at *6-7 (D. Del. Jan. 21, 2016) (dismissing exclusive dealing claims where plaintiff failed to provide a "factual basis upon which the court could consider the practical effects of [ ] exclusive dealing arrangements"); *PNY Techs., Inc. v. SanDisk Corp.*, Case No. 11-cv-04689, 2014 WL 1677521, at *7 (N.D. Cal. Apr. 25, 2014) (dismissing complaint where plaintiff "fail[ed] to adequately plead unlawful disclosure.").

**b.  Plaintiff's Amended Complaint Fails to Allege Substantial Foreclosure**

Plaintiff's Amended Complaint fails to sufficiently allege that Defendants have substantially foreclosed the relevant markets. *See Eisai*, 821 F.3d at 403 ("[W]e must consider whether a plaintiff has shown substantial foreclosure of the market for the relevant product."). Plaintiff's Amended Complaint offers several conclusory allegations but does not contain sufficient facts that would allow this Court to reach a finding of substantial foreclosure. The Court strains in vain to find the particularized factual showing necessary to overcome Defendants' Rule 12(b)(6) motion. The share of the market that has allegedly been foreclosed is a major component of a finding of substantial foreclosure. *See id*. ("To demonstrate substantial foreclosure, a plaintiff 'must both define the relevant market and prove the degree of foreclosure."). Plaintiff does not plead facts regarding the necessary degree of foreclosure.

The Court credits Defendants' argument that, at most, Plaintiff has plead foreclosure of no more than twenty percent of any market. *See* ECF No. 32-1 at 13. The argument proceeds as follows: Plaintiff alleges that Defendants maintain CEAs with the IDNs (1) HCA and (2) Providence Health. *See* ECF No. 26 at ¶¶ 144-46.[1] Plaintiff pleads that the top ten IDNs, which includes HCA and Providence, account for over twenty percent of all hospital beds in the United States. *See id.* at ¶ 90. These are two of the 576 IDNs in the United States. *See id.* at ¶ 86. Therefore, the two CEAs alleged in the First Amended Complaint necessarily cannot foreclose more than twenty percent of the relevant markets. This twenty percent is far less than the "traditional . . . threshold for liability in exclusive dealing cases" of forty percent. *See id.* at 404 n.31; *see also id.* at 404 ("[I]dentification of a few dozen hospitals out of almost 6,000 in the United States is not

---

[1] While Plaintiff has alleged that Defendants targeted other health systems, the First Amended Complaint does not contain any allegation that Defendants have entered into CEAs with any other IDN or health system.

enough to demonstrate 'substantial foreclosure.'"). Whether or not Defendants actually foreclosed more of the market or whether they engaged more hospitals is unknown, as it is not plead. From what is included in the First Amended Complaint, Plaintiff is unable to demonstrate that a sufficient share of the markets were foreclosed so to demonstrate substantial foreclosure—a necessary component of its claims.

Moreover, substantial foreclosure can be demonstrated when the alleged monopolist "deprive[s] customers of the ability to make a meaningful choice." *Id.* at 404 (quoting *ZF Meritor, LLC v. Eaton Corp*, 696 F.3d at 254, 285 (3d Cir. 2012)). Plaintiff has not sufficiently plead allegations that defendants' "anticompetitive conduct rendered that choice meaningless." *Id.* Plaintiff admits in the First Amended Complaint that Defendants do have competitors who are participants in each of the relevant markets. *See* ECF No. 26 at ¶¶ 36, 52, 68. Plaintiff alleges: "If Hill-Rom were the provider of choice for a customer, it would not need to prevent that customer from buying from other suppliers through a contractual exclusivity provision because customers naturally prefer to standardize." *Id.* at ¶ 178. This, however, is a legal conclusion, which does not suffice as an adequate factual allegation in the First Amended Complaint. While Plaintiff points to the fact that the Defendants occupy 70% of installed base of the relevant markets, s*ee id.* at ¶¶ 28, 48, 64, this does not negate the fact that the Complaint does not articulate any potential rivals who are barred from entering the relevant markets on account of the Defendants' alleged conduct. What Plaintiff does allege, again, is largely conclusory. *See e.g.*, *id.* at ¶ 189 ("The effect of [Defendants'] anticompetitive conduct is to block smaller or potential competitors from competing for sales to the affected customers and deprive competitors of an opportunity to gain economies of scale by shutting off the largest customers, thereby resulting in higher prices paid by Plaintiff and other hospitals and inferior products available to the market as a whole."). The First Amended

Complaint reads so as to not foreclose the possibility of another competitor entering the market: "The CEAs thus ensure that it is impossible for any competitor in the Relevant Markets *which does not manufacture a similarly broad line of products* to demonstrate how offered savings could offset the rebate potential on other products with Hill-Rom." *Id.* at ¶ 173 (emphasis added).

It is true that in *LePage's Inc. v. 3M*, the Third Circuit found an antitrust violation where the defendant used a bundled rebate system and "offered higher rebates when customers purchased products in a number of [defendant's] different product lines." 324 F.3d 141, 145 (3d Cir. 2003). Though, this holding has since been limited by the Third Circuit. *See ZF Meritor*, 696 F.3d at 274 n.11 ("The reasoning of *LePage's* is limited to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple product lines."). *LePage's* is distinguishable from this case. Here, as Plaintiff pleads, each of the beds is "a separate product market." *See* ECF No. 26 at ¶¶ 17, 38, 54. The two named competitors of Defendants—Linet and Stryker—each sell the three beds, *see id.* at ¶¶ 36, 52, 68, and are thus multiple-product producers. Accordingly, this set of facts does not fit into the limited scope of the panel's opinion in *LePage's*. *Cf 3Shape Trios A/S v. Align Tech., Inc.*, C.A. No. 18-1332-LPS, 2020 WL 6938054, at *3 (D. Del. Nov. 25, 2020) (denying motion to dismiss where complaint alleged that "a single-product producer, 'could not compete effectively' when [defendant] offered a discount for purchasing products in multiple product lines.").

### c.  Plaintiff Fails to Sufficiently Allege an Anticompetitive Agreement

Further, Plaintiff's First Amended Complaint fails because it does not adequately allege an anticompetitive agreement. *See Larry Pitt & Assocs.*, 57 F. Supp. 3d at 455 (dismissing claims due to absence of "facts from which the Court can infer that the agreements at issue were intended to

18

result in, have resulted in, or will result in restraint of trade."). Plaintiff argues, correctly, that it is "not required to plead detailed evidentiary matter in order to survive a motion to dismiss." *See* ECF No. 36 at 23 (citing *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 756 (E.D. Pa. 2014)). Nevertheless, what is present in Plaintiff's First Amended Complaint still does not provide the factual basis from which the Court conclude, under the *Iqbal* and *Twombly* standards, that the CEAs were anticompetitive. *See Int'l Constr. Prods*, 2016 WL 264909, at *6 ("[Plaintiff] need not prove its case in the complaint, but it must allege facts sufficient to 'plausibly suggest an entitlement to relief.'"

The essence of what is plead in the First Amended Complaint is Plaintiff's own conclusion that the CEAs are anticompetitive. This is insufficient. *See id.* (dismissing case where plaintiff alleged "no facts about the nature off the exclusive dealing arrangements and their potentially anticompetitive effects"). Plaintiff does not attach, quote, or otherwise reference anything from the CEA.[2]  Without any terms from the CEA, it is very difficult for the Court to conclude that the agreement is anticompetitive. Plaintiff pleads that the CEAs' exclusivity provisions are the "predominant mechanism of exclusion" utilized by Defendants to further their allegedly anticompetitive conduct. But on this point, the Court agrees with Defendants that, as contained in the First Amended Complaint, Plaintiff's allegations are devoid of any specifics as to this provision. *See* ECF No. 32-1 at 20 ("[T]he Amended Complaint never explains how the exclusivity provisions work, which products they cover, or how they 'secretly tie' exclusivity rebates for different products together.").

---

[2] The First Amended Complaint is noticeably absent of any allegation that Plaintiff itself has entered into a CEA with Defendants.

### d. Leave to Amend

It is true that, generally, "leave to amend should be freely given when justice so requires." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). However, leave to amend may be denied when the court finds "undue delay, bad faith, dilatory motive, prejudice, and futility." *Id.*; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) ("[A]mendment must be permitted in this context unless it would be inequitable or futile."). The Court declines to grant Plaintiff leave to amend its complaint here.

The First Amended Complaint (ECF No. 26) was Plaintiff's second opportunity to plead its case. Plaintiff filed his Complaint (ECF No. 1) on June 20, 2024, and Plaintiff filed its First Amended Complaint on September 30, 2024, following conferral with Defendants "regarding the legal arguments for why the Defendants maintain that Plaintiff's claims should be dismissed" on September 6, 2024, and September 13, 2024. *See* ECF No. 32-1 at 24. The parties met on October 22, 2024, prior to the filing of the instant Motion to Dismiss as well. *See id.* Given that Plaintiff has had the opportunity to cure the deficiencies identified by Defendants already, but failed to do so, the Court finds that "further amendment would be inequitable and likely futile." *In re Avandia Marketing, Sales Practices, and Prods. Liability Litig.*, 564 F. App'x 672, 673 (3d Cir. 2014) (affirming district court's dismissal of complaint with prejudice where the party already had the opportunity to amend but "failed to cure the complaint's pleading deficiencies."); *id.* ("Denial of leave to amend a complaint is especially appropriate where a party has already been given the opportunity to amend the complaint." (citing *Lake v. Arnold*, 232 F.3d 360, 374 (3d Cir. 2000)).

Here, although Defendants did not move to dismiss Plaintiff's First Complaint (ECF No. 1), Plaintiff did file an Amended Complaint following conferrals with Defendants about Defendants perceived deficiencies with the Complaint. *See United States v. Eastwick Coll.*, 657 F.

App'x 89, 97 (3d Cir. 2016) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."). The Court finds that Defendants would be prejudiced by permitting Plaintiff to file a Second Amended Complaint and have to forego another round of motions and briefing. Further, so many of Plaintiff's allegations stem from the CEAs, and Plaintiff's failure to provide any specific details regarding the terms of the CEAs further supports the Court's conclusion that allowing leave to amend would be inequitable at this point.

## V.    CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's Motion to Dismiss and dismisses Plaintiff's First Amended Complaint with prejudice. An appropriate order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge